[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
The Plaintiff in this matter is requesting the Court, after a non-jury trial, to order specific performance of a certain purchase and sales agreement. The Defendant executor, on behalf of the Defendant estate counters that title to the subject real estate must be "re-vested" in the estate.
Attorney Richard Applebaum became involved in the estate of Esther Aiello when, as counsel for Quinn Funeral Home, he attempted to collect on an unpaid bill. Attorney Applebaum proceeded to open a probate account for the deposit of potential assets. The estate contained real property consisting of three (3) contiguous unimproved parcels on Gordon Avenue in Warwick.
On April 26, 2001, the Probate Court declared that the Plaintiff's written offer to purchase the parcels was "the most preferable in its terms and conditions, offering the highest price and being equal to or in excess of appraised value." (Exhibit 2).
On May 4, 2001, Attorney Applebaum, on behalf of the estate, and the Plaintiff entered into a purchase and sales agreement which provided for a closing within twenty (20) days of the Plaintiff's procurement of a building permit. (Exhibit 3).
In July of 2001, Attorney Sanford Resnick while researching the titles uncovered a trio of tax title problems. The latter are detailed in a July 17, 2001 letter from Mr. Resnick to the Plaintiff. (Exhibit 6). Mr. Resnick, who has participated in over 50,000 closings, testified that it is "very common for tax sales to be redeemed at closings."
Delays ensued due to the Plaintiff's attempts to obtain funding for redemption purposes. By March 22, 2002, the Plaintiff had represented to Attorney Resnick that funds had been secured and a closing could occur in a timely manner. (Exhibit 8). On that same date, Attorney Applebaum informed the probate judge of the situation noting to her that ". . . of course the purchase and sales agreement pending for sale of the vacant lots of land would still have to be honored."
Summer of 2003 arrived, and the matter remained unresolved. The Defendant communicated to Attorney Resnick his concerns regarding fiduciary duty and his perceived unconstitutionality of the tax sale statute.
In the meantime, Mr. Fisher was assiduously, and at considerable expense, moving forward with the permitting process. He secured a building permit for a single-family dwelling as well as a residential assent from the Coastal Resources Management Council. Mr. Fisher testified that he remains ready, willing, and able to close.
The defense presented evidence (de bene) through appraiser William Floriani that the parcels in controversy are presently worth $100,000, two and one-half times the original purchase price. Since this evidence has no bearing on the validity or enforceability of the underlying purchase and sales agreement, the Court declines to admit it in full.
The Defendant contends that the Plaintiff is not entitled to specific performance because he was (1) confronted with an unmarketable title; and (2) he failed thereafter to elect to take title subject to the defects, or request a return of his deposit and cancel the contract, thereby placing himself in breach.
Under the purchase and sales agreement, it was the Plaintiff's clear option to accept "such title as the Seller is able to convey without abatement or reduction in purchase price." The credible evidence is unequivocal — the spectre of a defective title posed no impediment to Mr. Fisher's readiness, indeed eagerness, to close.
The Court rejects the Defendant's contention that it would be "unconscionable to hold the Defendant to perform under the contract in light of the Plaintiff's delay and non-performance, all of which worked to the detriment of the Defendant." The evidence, however, compels this Court to the inverse conclusion. Mr. Fisher conducted himself in an exceedingly diligent manner despite daunting delays not attributable to him and permit processes not within his control.
The Defendant further asserts that specific performance is precluded because the Plaintiff failed to execute his obligations under the contract within a "reasonable" time. The Defendant claims that the Plaintiff did not obtain the building permits or undertake legal action to clear the title in a timely fashion.
This contention is simply unsupported by the evidentiary record. Within ten (10) days of signing the purchase and sales agreement, Mr. Fisher engaged an engineer, at great expense, to generate the site plans requisite for permit application. The issuance of a building permit was complicated by the necessity of securing an assent from CRMC. As the Plaintiff was not the granting authority, he had no means of accelerating the issuance of the necessary permits. The Plaintiff clearly acted with due diligence and in good faith.
The Court also rejects the argument concerning the "delay" in undertaking "legal action." Once again, there is no credible evidence in the record to support such an assertion of fault on the part of the Plaintiff.
The defense next contends that because the Seller cannot "reasonable refuse" to close, a grant of specific performance is unwarranted. The persuasive evidence reveals that the Plaintiff, throughout the pendency of this "transaction," peppered the Seller with requests to close on the property. Stymied by the Seller and frustrated by delays which were not of his manufacture, the Plaintiff filed the instant action as a last resort. The conduct of the Seller actually fortifies the appropriateness of granting equitable relief to the Plaintiff.
Finally, the Defendant directs the Court to have no sympathy for the Plaintiff a "developer" [sic], a "man of wealth and taste." Sympathy forthe Devil — Rolling Stones. The Defendant tags Mssrs. Fisher and Resnick as "more sinners than saints" whose "game" was to maximize delay as the property appreciated in value.
Neither sympathy nor the satanic lyrics of the referenced "song" have anything to do with this case. Sympathy for the Devil is about killing/assassinating people including: Jesus Christ, Alexander III (on the eve of the enactment of Russia's first constitution), the Kennedys, and the victims of the 100 Years War and World War II.
The Code of Judicial Ethics instructs judges to make decisions without regard to sympathy, prejudice, or bias. The goddess of Justice is blindfolded because she evaluates evidence without reagrad to an individual's race, color, creed, or station in life.
After performing such an evaluation in this case, the Court is convinced, based upon the credible evidence, that fairness and equity mandate the granting of the relief sought. Therefore, the Plaintiff is ordered to honor and execute the purchase and sales agreement forthwith, redeeming any taxes from the resultant proceeds.